## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,
                                             Plaintiff,

    v.

PETER DICHIARA,
                                             Defendant.

Civil Action No. __-CV-____
(___)

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against the defendant, Peter DiChiara:

## SUMMARY

1.     This is a securities fraud enforcement action.  The defendant, a lawyer, provided substantial assistance to Morrie Tobin ("Tobin") and others working with Tobin in a deceptive scheme to sell publicly traded stock to investors.  Tobin secretly controlled a public company, Environmental Packaging Technologies Holdings, Inc. ("Environmental Packaging") and, working with a group of several other individuals, sought to profit from his undisclosed control at the expense of ordinary investors.  DiChiara acted on Tobin's behalf and used his position as an attorney to assist Tobin with critical parts of the scheme.

2.     DiChiara helped Tobin to conceal his control of Environmental Packaging, thus enabling Tobin to sell his shares: (a) without registering the offers or sales of stock with the Commission; (b) without disclosing accurate information about Tobin's ownership and control over the companies; and (c) without complying with limitations on the sale of stock by company "affiliates" such as Tobin.  As a result of the scheme, what appeared to be ordinary trading by

unaffiliated investors was actually a massive dump of shares by a company insider and his team seeking to profit at the expense of defrauded investors.

3.    A company is considered "public" when its securities trade on public markets and the company discloses certain business and financial information regularly to the public. Investors in certain public companies are required to disclose publicly any ownership interest in excess of 5% of the company's stock.  As part of the scheme, Tobin and others disguised Tobin's ownership to make it appear that his shares were owned by multiple unaffiliated entities and individuals.  In reality, these entities and individuals were merely holding the stock as nominees for Tobin, the true owner and control person.

4.    Working at Tobin's direction, DiChiara served as the lawyer for Tobin's public shell company and helped to negotiate and effectuate a reverse merger between the public shell company and a private company, which became Environmental Packaging.  Although the public shell company had a CEO, DiChiara took his direction from Tobin instead of the CEO, and also knew that the CEO took direction from Tobin.  DiChiara knew or was reckless in not knowing that under the terms of the reverse merger, Tobin, through his nominees, would retain control over substantially all of the purportedly unrestricted stock in Environmental Packaging.

5.    DiChiara helped Tobin conceal his ownership and control by, among other things, arranging for the transfer of stock from a group of Tobin's friends and relatives to a group of nominee entities.  DiChiara wrote legal opinion letters falsely stating that two of these nominee entities and a relative of Tobin were not "affiliates."  As a result of these legal opinions, restrictive legends were removed from shares of stock so that the stock would appear to be unrestricted and could be deposited with a broker and sold in the public market to investors.  In

reality, Tobin was and remained the beneficial owner of these shares, and the offer and sale of these shares was restricted by law because Tobin was an affiliate of Environmental Packaging.

6.     DiChiara also helped Tobin to transfer $1 million to an offshore entity and to conceal the true purpose of the payment through a purported consulting agreement DiChiara drafted.  Tobin then used the $1 million to pay for a $1 million promotional campaign touting the stock of Environmental Packaging.

7.     During the stock promotion, in June 2017, Tobin and others working in concert with him arranged to sell Tobin's shares of Environmental Packaging that were held by the nominee entities.  Tobin and his team failed to register their sales of Environmental Packaging stock with the Commission, and accordingly violated Sections 5(a) and (c) of the Securities Act of 1933.

8.     On June 27, 2017, the Commission suspended trading in the securities of Environmental Packaging.  After the Commission suspended trading and began issuing subpoenas in support of an investigation into the activities of Environmental Packaging, DiChiara worked with Tobin and others to conceal Tobin's control over Environmental Packaging and connection to the stock promotion in order to obstruct the Commission's investigation.  In particular, at Tobin's direction, DiChiara helped Tobin to "refund" to Environmental Packaging the $1 million that had been paid for the promotional campaign. To do this, DiChiara received those funds into his law firm's client account and then wired the funds to Environmental Packaging at Tobin's direction.

9.     As a result of the conduct alleged herein, DiChiara violated, and unless restrained and enjoined will continue to violate, Sections 5(a), 5(c), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), (c) & 77q(a)(2), (3)].  In addition, DiChiara

aided and abetted Tobin's group's violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 340.10b-5(a), (c)] and DiChiara also aided and abetted the public shell company's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder [17 C.F.R. § 340.10b-5(b)].

10.     The Commission seeks a permanent injunction against the defendant, enjoining him from engaging in transactions, acts, practices, and courses of business of the type alleged in this Complaint, conduct-based injunctions, disgorgement of the defendant's ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], an order barring the defendant from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.  For

example, during the Relevant Period, promotional materials concerning Environmental

Packaging were mailed to various individuals' residences in Massachusetts, and certain

individuals who reside in Massachusetts purchased stock of Environmental Packaging.

## DEFENDANT

13.     Peter DiChiara, ("DiChiara"), age 56, is a resident of Mount Kisco, New York.

DiChiara is a licensed attorney, and during the Relevant Period was a partner in a law firm in

New York, New York.

## RELATED PARTIES AND ENTITIES

14.     Environmental Packaging Technologies Holdings, Inc. ("Environmental

Packaging") is a public company which was incorporated in Nevada in 2011.  Environmental

Packaging initially was named GS Valet, Inc.  For several years, it purported to be a valet-

parking business.  In or about October 2012, its stock began trading on OTC Markets.  During

the same time period, the company began voluntarily filing quarterly, annual, and other periodic

reports with the Commission following an initial public offering to sell stock to prospective

investors.  In or around August 2013, Tobin acquired control of GS Valet, Inc., and subsequently

arranged for its name to be changed to International Metals Streaming Corp. ("International

Metals").  International Metals subsequently declared itself to be a shell company—a company

with no or nominal operations or assets.  In or about 2017, International Metals merged with

Environmental Packaging Technologies, Inc., a private company, and changed its name to

Environmental Packaging.  Environmental Packaging continued to trade on OTC Markets under

the ticker symbol EPTI and continued voluntarily to file periodic reports with the Commission.

According to reports filed with the Commission, Environmental Packaging is in the business of

manufacturing "flexitanks" used to transport liquids in shipping containers.  After the

Commission suspended trading in Environmental Packaging's stock in June 2017,
Environmental Packaging stock was traded on the so-called "Grey Market," where its stock
continued to be available for purchase or sale by brokers acting on instructions initiated by their
customers.

15.     Morrie Tobin, ("Tobin"), age 57, is a resident of Los Angeles, California.

16.     Brian Quinn, ("Quinn"), age 48, is a resident of Newport Beach, California.
During the Relevant Period, Quinn operated an investor relations company in Newport Beach,
California which, according to its website, "provides a wide variety of services for public
companies that need results-oriented investor relations programs," and "assist[s] private
companies with pre IPO services."

17.     David Skriloff, ("Skriloff"), age 54, is a resident of New York.  During the
Relevant Period, Skriloff was the chief executive officer ("CEO") of Environmental Packaging.

18.     Silverton SA ("Silverton"), now known as Wintercap SA, was a Swiss entity that
purported to be an asset manager.  In reality, during the Relevant Period, Silverton was an
offshore securities selling platform which catered to clients who were company insiders or
control persons, such as Tobin and his group.  Silverton's business model involved an ongoing
scheme to sell its clients' stock in the U.S. markets while concealing the clients' beneficial
ownership through nominee entities.

## BACKGROUND

19.      "Restricted stock" is stock of a publicly traded company (also known as an
"issuer") that is acquired from an issuer, or an affiliate of the issuer, in a private transaction that
is not registered with the Commission.  Stock held by an issuer or affiliate of an issuer is
restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock

cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  It also should disclose any person or group who is the beneficial owner of more than 5% of the company's securities.

20.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e. a control person).  "Control" means the power to direct management and policies of the company in question.  Typically, affiliates include officers, directors and controlling shareholders but any person who is "under common control" with an issuer may also be an affiliate.  Absent registration, affiliates are only permitted to sell a small percentage of their stock according to SEC Rule 144 [17 C.F.R. 230.144].

21.     "Unrestricted stock" is stock that may legally be offered and sold in the public marketplace by a non-affiliate, without registration or restriction, ordinarily having previously been subject to a registration statement filed with the Commission.  Registration statements are transaction specific and apply to each separate offer and sale as detailed in the registration statement.  Registration does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  For example, if a control person buys shares in the company he or she controls, those shares are subject to restrictions and ordinarily require a registration for any subsequent bulk sales of such shares.

22.     A "transfer agent" is a company which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership.  Many companies that have

publicly traded securities use transfer agents to keep track of the individuals and entities that own their stocks.  Share certificates for restricted stock typically bear a "restrictive" legend stating that it may not be resold in the public marketplace unless the sale is exempt from the Commission's registration requirements.  A transfer agent commonly removes the restrictive legends from stock after receiving a legal opinion letter from an attorney attesting, among other things, that the owner of the stock is not an "affiliate" of the public company.

23.     DTC eligibility means that a public company's securities may be deposited through the Depository Trust Company (DTC), a depository which holds securities and allows for securities to be traded electronically.  Most large U.S. broker-dealers and banks are DTC participants, meaning that they deposit and hold securities at DTC.  DTC eligibility is a prerequisite to book-entry transfer of securities, which facilitates the exchange of shares by broker-dealers in the secondary market.  DTC eligibility is essential to operating a pump and dump scheme because it enables the deposit of securities in a brokerage account so that they may be sold in the secondary market in bulk.

24.     The Over-The-Counter Securities Market ("OTC Markets") is an inter-dealer quotation and reporting service through which certain stocks are available for trading and are publicly purchased and sold through brokered orders.

## THE ENVIRONMENTAL PACKAGING SCHEME

25.     From in or around August 2013, Tobin secretly controlled the stock of the public company which would ultimately become Environmental Packaging.

26.     DiChiara began working for Tobin in or around June 2016.  At that time, the public company was named International Metals, and it was a shell company with no substantial operations.  Tobin's shares of International Metals were split among two groups of nominees:

(1) a large block of restricted stock was held by one of Tobin's nominee entities; and (2) smaller blocks of purportedly unrestricted stock were held by various of Tobin's friends and relatives.

27.     DiChiara was selected by Tobin to be the attorney representing International Metals in a reverse merger transaction with a private company, Environmental Packaging Technologies, Inc.

28.     In a reverse merger, a private company becomes a public company by purchasing a public shell company. Typically, the shareholders of the private operating company exchange their shares for a large majority of the shares of the public company. Although the public shell company is the legal entity that survives the merger, the private operating company's shareholders gain a controlling interest in the voting power and outstanding shares of stock of the public shell company.  The assets and business operations of the post-merger surviving public company are primarily, if not solely, those of the former private operating company.

29.     Here, Tobin and others scheming with him were interested in a reverse merger as a step toward creating an appearance of legitimate financial activity so that they could sell Tobin's secretly-held shares to investors and make a substantial profit.  To that end, the transaction was structured so that Tobin and his group would retain control of the smaller blocks of purportedly unrestricted stock which were held by various of Tobin's friends and relatives. These blocks of stock were the shares that, ultimately, Tobin intended to dump (that is, to sell to the public while disguising the fact that the shares were actually owned by a control person). Tobin also asked DiChiara to assist in obtaining DTC eligibility, which would allow Tobin's shares to be deposited with a broker and sold electronically, instead of being held in the form of physical stock certificates.

30.     DiChiara knew or was reckless in not knowing that Tobin controlled International Metals.  Although DiChiara's client was supposedly International Metals and not Tobin, and International Metals had a CEO, DiChiara took direction from Tobin concerning the reverse merger and understood that Tobin directed the CEO.  DiChiara also knew or was reckless in not knowing that Tobin's control over International Metals was a secret:  Tobin was not listed in the company's filings as being a 5% shareholder, officer, director, or any other type of affiliate. DiChiara also knew or was reckless in not knowing that Tobin did not own any shares in his own name; at the outset of his work and periodically thereafter, DiChiara reviewed shareholder lists from the transfer agent, which reflected that Tobin's ownership interests were not disclosed.

31.     Tobin informed DiChiara of the material terms of the reverse merger so that DiChiara could draft a term sheet and, later, the merger agreement.  Those terms were negotiated with David Skriloff, the CEO of Environmental Packaging Technologies, Inc., by Tobin and Brian Quinn, one of Tobin's partners in the scheme with whom Tobin agreed to share profits. Although Tobin had control over the stock, Tobin and Quinn discussed Tobin's shares as if they were jointly held because of their agreement to share in the proceeds from the sales, and they negotiated the transaction with Skriloff as if they jointly owned the stock.

32.     Tobin, Quinn, and Skriloff agreed that Environmental Packaging Technologies, Inc., would pay $1.5 million for International Metals, including $1 million which would be paid prior to the reverse merger and used to fund a stock promotion campaign.  This was, and remained throughout, the substance of the agreement, even as transactional documents were later changed to conceal the actual terms. A stock promotion campaign is typically an effort by parties to generate interest in a company's stock among investors, often in an effort to increase trading volume in the stock and/or boost the company's stock price.  Stock promotion materials may be

disseminated to potential investors in a variety of ways, including by mass emails or Internet-based newsletters.

33.     Under the agreement, Tobin and Quinn would retain approximately 12 million shares of purportedly unrestricted stock in International Metals, which was substantially all of its unrestricted stock.  International Metals would issue 40 million new shares of restricted stock—that is, stock that could not yet be sold in the market—to the shareholders of Environmental Packaging Technologies, Inc.  The surviving corporation, International Metals, would change its name to Environmental Packaging.  In effect, the reverse merger would leave Tobin and Quinn secretly holding nearly all of the resulting company's stock that could purportedly be sold in the U.S. market (the so-called "float").

34.     In the fall of 2016, at Tobin's direction, DiChiara drafted multiple term sheets and drafts of the merger agreement which reflected the terms of the deal as communicated to him by Tobin:  (1) the $1.5 million total purchase price which was to be reflected in the merger agreement, and (2) the fact that approximately 12 million shares of purportedly unrestricted stock would be retained by the "shareholders" of International Metals.

35.     DiChiara knew or was reckless in not knowing that the "shareholders" who would control substantially all of the float were really Tobin and his group.  In an email sent by Skriloff to Tobin, Quinn, and DiChiara, Skriloff explicitly described the actual substance of the deal, noting that the Tobin/Quinn "team" would be getting "$1.5 million and stock worth $4-5 million" and would "collectively become the largest shareholders as part of this."

36.     Tobin, Quinn, and Skriloff also agreed to a financing deal related to the reverse merger, in which Environmental Packaging Technologies, Inc. (the private company before the reverse merger) would raise approximately $5 million from investors in a private offering in

anticipation of the reverse merger, and would use $1 million of these funds to pay for the promotional campaign. DiChiara served as the Escrow Agent for amounts raised from investors.

37.     To conceal the payment of $1 million for a stock promotion campaign, Tobin and Skriloff attempted to disguise it as a fee for consulting services. At Tobin's direction, DiChiara revised the merger agreement to remove $1 million of the $1.5 million purchase price, reducing the disclosed purchase price to $500,000, and authored and distributed drafts of a purported consulting agreement for $1 million. In reality, as DiChiara knew or was reckless in not knowing, these new documents were false and misleading. The actual deal had not changed. Skriloff had agreed that Environmental Packaging Technologies, Inc., would pay $1.5 million to Tobin for the shell company. Skriloff did not expect any consulting services, and there was no actual consultant involved.

38.     In December 2016, International Metals publicly announced the reverse merger agreement, and filed a Form 8-K (a form used to notify investors about significant events) with the Commission. DiChiara drafted the Form 8-K, which described the agreement and attached a copy of the merger agreement. The Form 8-K prepared by DiChiara was misleading in that it failed to disclose that Tobin was the beneficial owner of and controlled substantially all of International Metals' shares before the reverse merger and that Tobin would control 20% of Environmental Packaging's outstanding shares (following the issuance of more than 40 million new shares as part of the reverse merger). In addition, the Form 8-K did not disclose that Tobin would control substantially all of the purportedly unrestricted shares of Environmental Packaging (the "float") after the reverse merger, leaving Tobin as the nearly exclusive seller.

39.     The merger agreement attached to the Form 8-K reflected that Environmental Packaging Technologies, Inc., had agreed to pay $500,000 "to the shareholder of the controlling

block" of stock in International Metals.  This was materially false and misleading in that it misrepresented the purchase price and concealed the fact that Skriloff had agreed that Environmental Packaging Technologies, Inc., would pay an additional $1 million to be used for the stock promotion desired by Tobin and Quinn as a condition of the merger.

40.     Between December 2016 and the completion of the reverse merger in June 2017, DiChiara performed additional legal work to help prepare Tobin to deposit his purportedly unrestricted shares with a broker or brokers and then sell his shares in the open market for a profit during the stock promotion.

41.     When DiChiara first began working for Tobin in 2016, substantially all of the purportedly unrestricted shares of International Metals were controlled by Tobin but held in physical share certificate form by five individual nominees.  DiChiara helped transform the physical certificates held in the names of Tobin's individual nominees into electronically tradeable stock so that Tobin could dump his shares in bulk in the U.S. market during the stock promotion campaign.

42.     This was accomplished by transferring Tobin's shares in stages from the five individual nominees to four offshore nominee entities, and then from the four offshore nominees to offshore selling platforms (one of which was Silverton), as set forth in the following diagram:



43.     As DiChiara knew or was reckless in not knowing, Tobin's offshore nominees collectively held, and then transferred to Silverton and another offshore selling platform, nearly the entire float of Environmental Packaging.  As a result, Tobin was positioned to be the nearly exclusive seller of Environmental Packaging stock during the promotional campaign.

44.     To accomplish the first stage of stock transfers, DiChiara drafted share purchase agreements under which Tobin's individual nominees purported to sell the shares held in their names to Tobin's offshore nominees.  DiChiara knew or was reckless in not knowing that the individual nominees were all associated with Tobin and were transferring their shares because Tobin had directed them to transfer the shares to the offshore nominee entities.  DiChiara obtained required forms and signatures from Tobin's individual nominees (using Tobin as the primary contact) and from Tobin's offshore nominees.  In turn, DiChiara instructed the transfer agent to consummate the transfers.  At various points, DiChiara had in his physical possession share certificates comprising nearly the entire float of Environmental Packaging.

45.     In addition to helping Tobin position his purportedly unrestricted shares for sale, DiChiara also helped Tobin prepare to sell restricted shares that were held by Tobin's relative (Friend/Relative D, above), and by two of Tobin's nominee entities (Offshore Nominee 2 and Offshore Nominee 4, above).  At Tobin's request, DiChiara authored two attorney opinion letters which requested that the transfer agent remove the restrictive legend from share certificates held by Tobin's relative.  DiChiara also authored and sent simultaneously to the transfer agent attorney opinion letters requesting that the transfer agent remove the restrictive legend from share certificates held by Offshore Nominee 2 and Offshore Nominee 4.   In each letter, DiChiara falsely attested that the respective nominee was not an "affiliate" of International Metals.  In reality, as DiChiara knew, recklessly disregarded, or should have known, Tobin was the beneficial owner of all of those shares.  As an experienced securities lawyer, DiChiara understood that, because Tobin was an affiliate of International Metals, the share certificates were restricted from public sale and ought to retain their restrictive legend.

46.     At Tobin's request and direction, in advance of the reverse merger DiChiara also helped International Metals obtain eligibility to have its shares traded in electronic form through DTC.  DiChiara authored an attorney opinion letter directed to DTC in which he falsely stated that shares held for Tobin by one of Tobin's individual nominees (Friend/Relative E, above) were not "restricted securities" and were "freely transferable without registration under the Securities Act by a holder which is not an 'affiliate'" of International Metals.  DiChiara knew, was reckless in not knowing, or should have known that Tobin was the beneficial owner of the shares held in the name of Friend/Relative E, and that, as a legal matter,  the shares were not "freely transferable without registration" because Tobin was an affiliate of International Metals.

47.     Tobin and others working in concert then arranged to open accounts at offshore asset managers in the names of Tobin's nominee entities.  At Tobin's direction, DiChiara arranged for a second stage of transfers, from Tobin's offshore nominee entities to Silverton and another offshore selling platform.  To accomplish this, DiChiara informed the transfer agent that the offshore nominee entities would be depositing their shares electronically with a broker. DiChiara sent to the transfer agent the physical share certificates held in the names of the offshore nominees, which DiChiara had retained in his office since the first stage of transfers. DiChiara also instructed the transfer agent to retain any physical share certificates that had not yet been sent to DiChiara because of the looming deposits.  DiChiara obtained required forms and signatures and provided them to the transfer agent.

48.     Because Tobin's shares appeared to be unrestricted and because Tobin's affiliate status was concealed, the offshore asset managers were able to deposit the shares with brokers in blocks that were carefully designed to remain under 5% of the company's stock.  This created the false appearance that no single nominee or Tobin owned more than 5% of the company's stock.  This façade enabled Tobin's group to evade SEC rules that required Environmental Packaging to list all persons holding greater than 5% of its outstanding stock in reports filed with the Commission.

49.     As agreed with Tobin and Quinn, Skriloff solicited investments in anticipation of the reverse merger in order to finance the stock promotion campaign for Environmental Packaging in support of Tobin's unregistered sale of millions of shares of his stock.  Unbeknownst to those investors, Tobin, Quinn, and Skriloff had agreed that $1 million of the funds raised from investors would be used to pay for a promotional campaign targeting

investors and potential investors in Environmental Packaging.  The money raised from investors

was sent to DiChiara's law firm, which served as the Escrow Agent.

50.     In anticipation of the reverse merger, Tobin and Quinn hired a company (the

"Stock Promoter") to lead a promotional campaign carefully timed to coincide with the

announcement of the completion of the reverse merger in June 2017.  The Stock Promoter's role

was to target potential investors with a mass mail and mass email promotional campaign

designed to create interest in Environmental Packaging stock.

51.     On or about May 20 through May 25, 2017, with Skriloff's authorization and

Tobin's wiring instructions, DiChiara wired approximately $1 million from his law firm's IOLA

account, which was used to hold escrowed funds on behalf of Environmental Packaging

Technologies, Inc., to a bank account used by Silverton. Tobin and others then arranged for these

funds to be transferred to the Stock Promoter for the purpose of promoting Environmental

Packaging and its stock.  Whether or not DiChiara knew the precise purpose for which Tobin

directed DiChiara to wire the funds, DiChiara knew or was reckless in not knowing that the true

purpose of the payment was being concealed with a sham consulting agreement, which DiChiara

himself had drafted.

52.     On or about June 12, 2017, the Stock Promoter began disseminating marketing

and promotional materials concerning Environmental Packaging.  For example, a 16-page glossy

mailer was sent by U.S. mail to thousands of investors across the United States, and touted the

stock of Environmental Packaging with statements such as, "Environmental Packaging . . . Could

be Perfectly Positioned To Put Up To 1,118% In Your Pocket!"

53.     In June 2017, DiChiara participated in drafting a Form 8-K to announce the

completion of the reverse merger which was filed with the Commission by Environmental

Packaging on June 12, 2017.  Like the prior Form 8-K that had announced the reverse merger, this Form 8-K was misleading in that it failed to state that Tobin was the beneficial owner of and controlled substantially all of Environmental Packaging's shares before the reverse merger and that Tobin would control 20% of Environmental Packaging's outstanding shares (following the issuance of more than 40 million new shares as part of the reverse merger).  Likewise, the June 2017 Form 8-K did not disclose that Tobin controlled substantially all of the purportedly unrestricted shares of Environmental Packaging (the "float") after the reverse merger, leaving Tobin as the nearly exclusive seller.

54.     The June 2017 Form 8-K also attached an amendment to the merger agreement which described the terms of the agreement, and stated that Environmental Packaging Technologies, Inc. had agreed to pay $550,000 "to the shareholder of the controlling block" of Environmental Packaging stock.  This was materially false and misleading in that it concealed the fact that Environmental Packaging Technologies, Inc. agreed to pay (and in fact, had already paid) an additional $1 million for the stock promotion desired by Tobin and Quinn as a condition of the merger.

55.     Prior to the promotional campaign, there was virtually no public trading of Environmental Packaging's stock.  The average daily trading volume of Environmental Packaging's stock during the period from May 1, 2017, through June 9, 2017 (a Friday), was less than 23,000 shares per day, and on most days during that period of time, Environmental Packaging's stock did not trade at all in the public securities markets.   By contrast, on or about June 12, 2017, the first day of the paid promotional campaign, approximately 424,956 shares of Environmental Packaging traded in the public securities markets.  In this flurry of trading, Tobin sold approximately 224,000 shares, accounting for over half of the day's trading activity.

56.     On or about June 13, 2017, Tobin sold 66,000 shares of Environmental Packaging stock, accounting for more than a quarter of the day's trading activity.

57.     Thereafter, the offshore selling platforms continued to sell Tobin's Environmental Packaging stock.  Between June 14 and 27, 2017, the offshore selling platforms dumped approximately 735,000 additional shares of Environmental Packaging stock into the public securities markets to investors.  Collectively, Tobin's sales of Environmental Packaging stock in June 2017 generated approximately $1.5 million in trading proceeds.

58.     By virtue of the scheme perpetrated by Tobin and his group, with DiChiara's substantial assistance, the sales of Tobin's stock were presented and processed as if they were ordinary market sales of a widely-traded stock.  In reality, the purchasers were buying the stock of a company insider who was illegally and secretly dumping his shares.

59.     These stock sales were not registered pursuant to Section 5 of the Securities Act. Tobin's Environmental Packaging stock was, by law, restricted from resale because Tobin was an affiliate of Environmental Packaging.  The sales of Tobin's Environmental Packaging stock also failed to meet the conditions of SEC Rule 144.

60.     DiChiara's law firm was paid approximately $40,000 as a flat fee for the work performed by DiChiara at Tobin's direction concerning Environmental Packaging, and DiChiara received approximately $15,000 personally.

61.     After the Commission suspended trading in Environmental Packaging's stock on June 27, 2017, the staff began an investigation and issued subpoenas in the following months to a number of individuals and entities, including Tobin, Environmental Packaging, a company operated by Quinn, and DiChiara's law firm.  Among other things, the subpoenas required the

production of documents concerning Environmental Packaging and the above-mentioned conduct.

62.    Tobin discussed the Commission's investigation with others, including DiChiara, and they coordinated efforts to conceal the Environmental Packaging scheme and to thwart and obstruct the Commission's investigation.

63.    Tobin and Skriloff attempted to conceal the source of the $1 million payment that had been used to pay for the stock promotion by: (a) raising another $1 million from new investors by selling them some of Tobin's shares in private transactions and (b) using those funds to "refund" $1 million to Environmental Packaging under the guise of a cancelled consulting agreement.  In reality, there was never any real consultant, the $1 million purportedly paid to the "consultant" had actually been spent on the promotion, and the money being "refunded" was actually money that had been newly raised from investors through stock sales.

64.    At Tobin's request, DiChiara prepared stock purchase agreements in which several of Tobin's nominee entities sold shares of Environmental Packaging to several associates of Tobin.  After Tobin's associates wired funds to DiChiara's law firm account, DiChiara wired the funds—approximately $1 million—to Environmental Packaging, not the nominees, at Tobin's direction.  DiChiara knew or was reckless in not knowing that Environmental Packaging would falsely represent that the $1 million wired from Tobin constituted a return of fees associated with a cancelled consulting agreement.

65.    DiChiara further informed Tobin that DiChiara had deleted or destroyed the final version of the sham consulting agreement, in order to fit the false narrative about a cancelled consulting agreement.

## FIRST CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act

66.     Paragraphs 1 through 65 above are re-alleged and incorporated by reference as if fully set forth herein.

67.     During the Relevant Period, the shares of stock of Environmental Packaging were securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

68.     By reason of the conduct described above, the defendant, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

69.     As a result, the defendant violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a)(2) and (3) the Securities Act

70.     Paragraphs 1 through 65 above are re-alleged and incorporated by reference as if fully set forth herein.

71.     During the Relevant Period, the shares of stock of Environmental Packaging were securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

72.     By reason of the conduct described above, the defendant, in connection with the offer or sale of securities of Environmental Packaging, by the use of the means or

instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge, state of mind or negligence (i) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

73.     By reason of the conduct described above, the defendant violated Securities Act Sections 17(a)(2) and (3) [15 U.S.C. § 77q(a)(2) and (3)] and will continue to violate those sections unless enjoined.

## THIRD CLAIM FOR RELIEF
### Violations of Section 20(e) of the Exchange Act

74.     Paragraphs 1 through 65 above are re-alleged and incorporated by reference as if fully set forth herein.

75.     During the Relevant Period, the shares of stock of Environmental Packaging were securities under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

76.     By reason of the conduct described above, Morrie Tobin and others acting in concert directly or indirectly, in connection with the purchase or sale of securities of Environmental Packaging, by the use of the means or instrumentalities of interstate commerce or of the mails, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

77.     The defendant knowingly or recklessly provided substantial assistance to the primary violators in their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

78.     As a result, the defendant violated Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e).]

### FOURTH CLAIM FOR RELIEF
### Violations of Section 20(e) of the Exchange Act

79.     Paragraphs 1 through 65 above are re-alleged and incorporated by reference as if fully set forth herein.

80.     During the Relevant Period, the shares of stock of Environmental Packaging were securities under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

81.     By reason of the conduct described above, Environmental Packaging, directly or indirectly, in connection with the purchase or sale of securities of Environmental Packaging, by use of the means or instrumentalities of interstate commerce or of the mails, knowingly or recklessly, made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     The defendant knowingly or recklessly provided substantial assistance to Environmental Packaging in its violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)) and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

83.     As a result, the defendant violated Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e).]

## FIFTH CLAIM FOR RELIEF
### Violations of Section 15(b) of the Securities Act

84.     Paragraphs 1 through 65 above are re-alleged and incorporated by reference as if fully set forth herein.

85.     During the Relevant Period, the shares of stock of Environmental Packaging were securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

86.     By reason of the conduct described above, Morrie Tobin and others acting in concert, in connection with the offer or sale of securities of Environmental Packaging, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge, state of mind or negligence employed devices, schemes, or artifices to defraud, obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     The defendant knowingly or recklessly provided substantial assistance to the primary violators in their violations of Sections 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

88.     As a result, the defendant violated Section 15(b) of the Securities Act [15 U.S.C. §§ 77o(b)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.      Enter a permanent injunction restraining the defendant, his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating

Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

B.      Enter a permanent injunction restraining the defendant, his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)];

C.      Enter an injunction restraining the defendant from directly or indirectly issuing or preparing professional legal opinions to any person or entity in connection with the offer or sale of securities pursuant to, or claiming, an exemption under Section 4(a)(1) predicated on Securities Act Rule 144, or any other exemption from the registration provisions of the Securities Act;

D.      Enter an injunction restraining the defendant from directly providing professional legal services to any person or entity in connection with the offer or sale of securities pursuant to, or claiming, an exemption under Section 4(a)(1) predicated on Securities Act Rule 144, or any other exemption from the registration provisions of the Securities Act;

E.      Order the defendant to disgorge, with prejudgment interest, all ill-gotten gains he obtained by reason of the unlawful conduct alleged in this Complaint;

F.      Order the defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

G.      Enter an order prohibiting the defendant from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

H.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

I.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.


DATED this 3rd day of September 2020.


Respectfully submitted,


David M. Scheffler (Mass Bar No.670324)
Rebecca Israel
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8810 (Scheffler direct)
Fax: (617) 573-4590 (fax)
schefflerd@sec.gov (Scheffler email)